UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAMIAN BELANDER,

                        Petitioner,

        v.

COREY FUHURE,

                        Respondent.

CASE NO. 3:23-CV-6132-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: May 3, 2024

    The District Court has referred this federal habeas action to United States Magistrate Judge David W. Christel. Petitioner Damian Belander, proceeding *pro se* and *in forma pauperis*, filed a federal habeas petition pursuant to 28 U.S.C. § 2254, seeking relief from his state-court conviction and sentence. Dkt. 1. Respondent filed an Answer and Memorandum of Authorities, arguing Petitioner is not entitled to habeas relief because the state courts' adjudication of each ground raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 13. The undersigned agrees and therefore recommends the Petition (Dkt. 1) be denied and a certificate of appealability not be issued.

## I.    Factual Background

Petitioner is currently incarcerated at Eastern Oregon Correctional Institution and is serving a 385-month sentence of incarceration arising out of a jury conviction for premeditated murder in the first degree and arson in the second degree before the Superior Court of Washington for Skamania County ("trial court"). *See* Dkt. 1; Dkt. 14-1 at 6 (Judgment and Sentence).

The Court of Appeals of the State of Washington ("state court of appeals") summarized the factual and procedural background of Petitioner's jury trial and conviction as follows:

### I. Factual Background

**A. Discovery of the Burnt Van and Brian Bodle's Body**

On January 24, 2019, Mitchell Gundy-Hampton was near the Ape Caves area on Forest Road 83 "enjoying the mountains" with his dogs. On his way up to the mountains, he noticed a "burnt up" van on the side of the road. On his way back down, Gundy slowed down to get a better look. He noticed something in the brush. He got out of his vehicle and discovered a person laying on the ground.

Shortly thereafter, at approximately 2:00 p.m., Gundy managed to flag down a couple hiking in the area. Gundy used their cell phone to contact the police to report the body. The body was later identified as Brian Bodle.

**B. The Events Leading up to Bodle's Death and the Events Thereafter**

Bodle was a known heroin user and dealer. On January 22, 2019, Bodle contacted Breanna Teafatiller and asked to borrow $200, which he planned to use to purchase heroin in Portland, Oregon. Bodle borrowed a truck from a business associate, Jason Stacey, in exchange for some heroin.

At about 10:00 p.m. on January 22, 2019, Bodle arrived at Teafatiller's apartment in Mount Angel, Oregon. After Teafatiller gave Bodle the money, Bodle stated that he needed to go to a gas station. Bodle was not familiar with the area, so he asked Teafatiller to accompany him and provide directions. Teafatiller agreed and got in the truck. When they arrived, the gas station was closed. Bodle drove back to the apartment, but ran a stop sign in the process.

At about 10:50 p.m., Cody Best, a police officer for the City of Mount Angel, observed Bodle running the stop sign and initiated a traffic stop. Officer Best issued Bodle multiple citations for driving an uninsured vehicle, driving with a suspended license, and for failing to obey a traffic control device. Officer Best impounded the truck based on the multiple traffic violations.

Bodle now needed a ride to Portland. Teafatiller contacted [Petitioner] via Facebook messenger to help Bodle. [Petitioner] told Bodle to call him, and the two began communicating. Bodle then sent [Petitioner] a friend request on Facebook, which [Petitioner] accepted. Bodle agreed to pay [Petitioner] to drive him to Portland.

In January 2019, [Petitioner] drove a red or maroon 2002 Chrysler Voyager, which was owned by his mother's then-boyfriend, Joshua Lewis. The vehicle had an issue with overheating, and Lewis stated that it was "pretty common to have jugs of water in the car."

Teafatiller stated that [Petitioner] arrived at her apartment in a "red minivan" when he came to pick up Bodle. Teafatiller also stated that [Petitioner] asked her to fill up water jugs for the van because it was having an overheating problem.

[Petitioner] and Bodle left Teafatiller's apartment at about 3:00 a.m. on January 23. At 5:23 a.m., Stephen Jaeger, one of Bodle's customers, received a message from Bodle stating that he was on his way back to McMinnville, Oregon. That was the last time Jaeger heard from Bodle, but he continued to reach out to him to purchase heroin. Shortly thereafter, at approximately 6:00 a.m., Teafatiller received a message from Bodle stating, "I up," which she took to mean as "you up." Teafatiller attempted to contact Bodle when she woke up, but he never responded. At 6:08 a.m., [Petitioner]'s phone pinged[1] off a cell tower in Troutdale, Oregon. At about 6:30 a.m., [Petitioner]'s phone pinged off a cell tower in Gresham, Oregon. [Petitioner]'s phone records indicated no outgoing activity from about 6:30 a.m. to 3:30 p.m. Then, at about 3:30 p.m., [Petitioner]'s phone pinged off a cell tower in Washougal, Washington. [Petitioner] either checked his voice mail or initiated a call 23 times from 3:32 p.m. to 7:05 p.m.

Frustrated that Bodle would not respond and worried about not being repaid, Teafatiller called [Petitioner] at 3:43 p.m. on January 23. [Petitioner] did not answer. Teafatiller messaged [Petitioner] demanding that he call her, to which [Petitioner] responded "why?" [Petitioner] told Teafatiller that Bodle had stolen his van and that he was angry. [Petitioner] claimed that Bodle stole the van at a gas station, but refused to give details about how or where that happened.

Teafatiller told [Petitioner] that he should file a report concerning the stolen van, but [Petitioner] refused. [Petitioner] claimed that there could be a firearm in the van and indicated that, as a felon, he was not allowed to possess firearms. Later on, Teafatiller offered to report the stolen van for [Petitioner] and asked for a description of the vehicle. [Petitioner] told Teafatiller that she was "trippin" and blocked her from messaging him. At 4:29 p.m. on January 23, [Petitioner] removed Bodle as a Facebook friend.

From 7:05 p.m. to 11:13 p.m., on January 23, [Petitioner]'s phone records show that he received seven phone calls that went straight to voice mail and four

---

[1] The United States Supreme Court has explained that, "[c]ell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site.... Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information." *Carpenter v. United States*, ‒‒‒ U.S. ‒‒‒‒, 138 S. Ct. 2206, 2211 (2018). "Pinging" is simply the process of sending a signal to identify the location of a cell phone. *State v. Muhammad*, 194 Wn.2d 577, 582 n.1, 451 P.3d 1060 (2019).

text messages. [Petitioner]'s phone never pinged off a cell tower during that period of time.

At 8:56 p.m. on January 23, a red van matching the description of Lewis's 2002 Chrysler Voyager was captured travelling eastbound on Lewis River Road in Woodland, Washington on an ampm [sic] video camera. Then, at 9:42 p.m., a video camera on the Swift Dam captured the same vehicle and a dark sedan driving eastbound. At 10:04 p.m., the same sedan was captured heading westbound back toward Woodland on the Swift Dam video cameras.

Jeremy Schultz, a detective for the Skamania County Sheriff's office, stated that coming from the west side, the most common and direct route to where the burnt van was found would be through Woodland on Lewis River Road. From this route, one cannot reach the location of the burnt van without passing the Swift Dam. Detective Schultz also stated that it would take approximately 47 minutes to get from the ampm in Woodland to where the Swift Dam cameras were. Schultz stated that it would take approximately eight minutes to get where the burnt van was located on Forest Road 83 from the Swift Dam cameras.

At 11:13 p.m. on January 23, [Petitioner]'s phone pinged off of a cell tower in northern Vancouver, Washington. Detective Schultz testified that the timing of [Petitioner]'s phone records and surveillance footage was consistent with how long it would take to travel to and from Forest Road 83 from the northern Vancouver area.

At about 11:33 p.m. on January 23, [Petitioner] contacted Felicity Torres, his ex-girlfriend, via Facebook messenger. [Petitioner] told Torres that "he's been going crazy…being wild." He also told her that he was angry at everything, he was losing himself, and that he was in Portland and needed help. [Petitioner] told Torres that some of his belongings were stolen, and asked her for clothes and shoes. Torres asked what had happened. [Petitioner] responded, "I'm not gonna explain it over the phone." The two shared a brief phone conversation and [Petitioner] asked Torres to contact his mom to report the van as stolen. Torres stated that she knew the van was "either a Town and Country, or a Chrysler." But, a couple of days later, when Torres asked for further clarification about the make and model of the van, [Petitioner] told her that it was a Honda. [Petitioner] also did not give specific details about what happened, who stole the van, or where it was stolen.

[Petitioner] contacted Amber Greenfield on January 23, about being stranded in Washington. The next day, Greenfield asked [Petitioner] about the stolen van, but he did not respond. Greenfield asked [Petitioner] to call her and that she would give him "a ride no matter what." Then, on January 27, [Petitioner] told Greenfield that "he was f***ed up in the head" and that "he needed to leave the state." Greenfield responded, "now?" And [Petitioner] replied, "like I'm f***ed."

On January 24, [Petitioner] contacted Lydia Layton on Facebook messenger asking for help. [Petitioner] told her that his clothes were "wet and bloody." The next day, [Petitioner] asked for fresh clothes and Nikes. He also offered to sell heroin to Layton. [Petitioner] also messaged another Facebook friend on January 25, asking for fresh clothes and Nikes.

[Petitioner] messaged his friend Melanie Tobaner at about 3:00 a.m. on January 24. [Petitioner] asked if they used heroin, to which Tobaner responded in

the affirmative. [Petitioner] asked if they needed some and said that he needed a ride back to McMinnville because he had "gotten himself into a situation, where he had to leave his car, and almost everything he owned." [Petitioner] also indicated that he needed fresh clothes and shoes.

[Petitioner] messaged his friend Cesar Ornelas-Ortiz on January 24. [Petitioner] told Ornelas-Ortiz, "I need your help, it's an emergency." Ornelas-Ortiz asked [Petitioner], "what the f**k is going on, what's going bad?" [Petitioner] responded, "I might be in prison the rest of my life." [Petitioner] stated that he did not have a vehicle and could not be seen. He also stated that "no one must know that I'm talking to you right now." [Petitioner] messaged another friend stating, "I've ruined my life completely and it's all my fault."

[Petitioner] informed at least 10 people that he had heroin for sale in the late hours of January 23. However, [Petitioner] was not primarily known as a heroin dealer. And prior to that time frame, [Petitioner] had not messaged anybody about heroin.

### C. The Cause of the Vehicle Fire and Forensic Testing of Items Found at the Crime Scene

Joshua Barnes, the deputy fire marshal for the Clark County Fire Marshal's office, was assigned to investigate the cause of the vehicle fire. Based on his training and experience, Barnes stated that the "2002 Chrysler Voyager was intentionally set on fire." Specifically, Barnes stated that the "origin of the fire was the interior of the vehicle, and the cause was handheld flame." Barnes further noted that the flame began in the driver's side of the vehicle while the back hatch was open, which helped fuel the fire.

Bodle's body was found in a wooded area close to the burnt up van. The investigation revealed that there was some disturbance in the surrounding vegetation and that there were drag trails from the rear of the van to Bodle's final resting place. Detective Schultz stated that, based on the damaged vegetation, drag trails, and state of Bodle's clothing, he believed that Bodle was intentionally placed in the wooded area.

Several other items were found lying on the ground near the van and Bodle's body. These items included a black shoe, pink towel, a shirt, a black Harley Davidson sweatshirt, a stocking cap, and a Coors Light beer can. A tire iron was also discovered amongst the burnt debris.

Heather Pyles, a forensic DNA analyst with the Washington State Patrol Crime Laboratory, processed the items discovered at the crime scene. Pyles stated that there was "very strong support" for the inclusion of [Petitioner]'s DNA on the stocking cap found near Bodle's body. Bodle's DNA was excluded as a contributor to the stocking cap. Pyles also processed the jacket that Bodle was wearing at the time of his death. Pyles stated that law enforcement sent a photograph which showed that the left shoulder of the jacket was bunched up and had a tear or rip in the bottom left arm seam. Pyles also stated that there was "very strong support" for the inclusion of [Petitioner]'s DNA on the left shoulder of Bodle's jacket. Pyles did not test the tire iron for DNA because it was subject to fire damage which would not leave detectable traces of DNA.

1

2     **D. The Cause of Bodle's Death**

3          Dr. Megan Quinn, a forensic pathologist for the Clark County Medical

4     Examiner's office, performed the autopsy on Bodle's body. Dr. Quinn determined

      that the cause of death was "[b]lunt force injury to the head." During her

5     examination, Dr. Quinn noticed that there were small fragments of brain matter and

6     blood inside of the hood of Bodle's jacket. She also noticed that most of the blood

      that soaked the jacket was in the hood and upper back area. Dr. Quinn described

7     Bodle's head injury as a "zigzag laceration, to the vertex of the scalp," which is

      indicative of blunt force injury.

8          Dr. Quinn stated that she was confident that "there had been more than one

9     blunt force impact" to cause Bodle's death. Specifically, based on the zigzag

      laceration and two other discrete wounds, Dr. Quinn stated that "there had been at

10    least three blunt force impacts to the head, if not more." Quinn stated that Bodle

11    likely did not die immediately from the blunt force injuries, but likely remained

      unconscious for a few minutes to an hour until he bled out. Dr. Quinn further stated

12    that Bodle's injuries were consistent with being hit on the head with a tire iron or

      any rod-like structure with a little ball on the end.

13         Bodle had amphetamines and opiates in his system and a blood alcohol

14    concentration of .117 at the time of his death.

15    **E. Charging Information**

16         On January 31, 2019, [Petitioner] was arrested in Yamhill County, Oregon

      on an unrelated matter. By fourth amended information, the State charged

17    [Petitioner] with one count of murder in the first degree (premediated) (count I),

18    one count of murder in the first degree in the course of another crime (arson in the

      second degree) (count II), one count of murder in the second degree (intentional

19    murder) (count III), one count of murder in the second degree in the course of a

20    felony (assault in the second degree) (count IV), and one count of arson in the

      second degree (count V). The State also alleged that [Petitioner] committed counts

21    I–IV while armed with a deadly weapon other than a firearm. [Petitioner] pleaded

22    not guilty and the case proceeded to a jury trial.

                              **II. The Trial**

23    **A. CrR 3.5[2] Hearing and Admission of the Custodial Interview During Trial**

24         Detectives Monty Buettner and Schultz travelled to the Yamhill County

      Sheriff's office to get a statement from [Petitioner] following his arrest on an

      unrelated matter. The detectives conducted an hour-long recorded interview that

      occurred in two parts. The first half of the recording begins with Detective Buettner

      _____

      [2] Rule 3.5 of the Washington State Superior Court Criminal Rules requires a hearing to determine the
      admissibility of any statement of a criminal defendant before it can be offered into evidence.

stating, "all right, the recorder's on and we're detectives with the Skamania County Sheriff's Office. Because you're here, do you know, what are you arrested for?" Detective Buettner also read [Petitioner] his *Miranda* warnings in the first recording. [Petitioner] answered in the affirmative when asked if he understood his rights. The second recording does not mention the recording device or *Miranda* warnings.

The second half of the recording began with Detective Buettner stating, "excuse me, [Petitioner], Josh, you said, was your mom's boyfriend, right?" The second half concluded with [Petitioner] asserting his right to remain silent and right to counsel:

> [Petitioner]: I'm not answering hard questions, so.
> Detective Buettner: Okay, that one a hard one?
> [Petitioner]: No, it's not a hard one. *It's just like, I'm tired of dealing with all this bullsh\*t, so like, if you want to talk to me, you can talk to a lawyer.*
> …
> [Petitioner]: So, like I said, if you guys are done, I'm done.
> Detective Buettner: If we're done?
> [Petitioner]: Yeah, if you're done asking questions.
> Detective Buettner: Okay. All right, that's fair.
> Detective Buettner: I'm not done asking questions.
> [Petitioner]: Okay, well, I'm done answering questions.
> Detective Buettner: Oh, okay, I just needed that clarification then, because I thought you were telling me that, if I'm done asking questions, then we can go, but if I'm not done, then we can stay. That's not what you're saying?
> [Petitioner]: What I'm saying is, I don't know anything, what you guys are talking about, and I've never been these places, that you say that I've been, and so, like, and you guys aren't gonna believe me either way, so I'm done answering questions.

Neither recording began with nor ended with an indication of the time.[3]

The trial court held a CrR 3.5 hearing to determine the admissibility of the custodial interview. The court concluded that "any statements after the indication of, if you want to talk to me, you can talk to a lawyer, is an unequivocal request, to invoke his rights to remain silent at that point in time, and anything, after that point in time, will be inadmissible, at the time of trial."

At trial, the State played the two-part custodial interview for the jury, which [Petitioner] did not object to. The recording concluded with the following exchange:

> [Petitioner]: Look, I'm not answering hard questions, so.
> Detective Buettner: Okay, that one a hard one?

---

[3] Section 9.73.08(b)(ii) of Washington Revised Code states audio recordings of arrestees by law enforcement "shall" begin and end with an indication of the time of the recording.

REPORT AND RECOMMENDATION - 7

[Petitioner]: No, it's not a hard one. *It's just like I'm tired of dealing with all this bullsh\*t.*

During the direct examination of Detective Schultz, the State did not follow up on [Petitioner]'s comment at the conclusion of the recording. Instead, the State questioned Detective Schultz on [Petitioner]'s whereabouts based on his cell phone records and camera footage.

## B. Closing Arguments

During closing, the prosecutor stated that defense counsel's alternative theories of the case were ridiculous based on the totality of the evidence. Specifically, during rebuttal, the prosecutor stated that:

> [N]o other alternative makes sense, with the evidence. Defense counsel gave you an alternative theory that is ridiculous. It doesn't make any sense at all. That theory is sure fanciful speculation, and that's all it is, right; because in order to believe it, you've got to believe that, [Petitioner] wasn't lying about the van, and yet, he, clearly, was lying about the van. There's no other explanation for it. He didn't even tell a consistent story, to his friends, and then, when he had the chance to talk to law enforcement, defense counsel will make a big deal, about how they didn't tell him, why he was there; he knew why they were there. Look at the Facebook messages; he knew, exactly, what was going on; he was concerned, about the van being reported stolen; he knew, exactly, what was going on. All of that, is just smoke and mirrors, and defense counsel, trying to confuse you, right, because in his own words, he thinks he'll beat it, which, that's not, I didn't do it.

The prosecutor also commented on defense counsel's attempt to draw a reasonable doubt based on the State's method of DNA testing. The prosecutor explained to the jury why the State did not test all surface areas of the collected evidence or why it omitted testing other items. The prosecutor then urged the jury to reject defense counsel's arguments:

> Now, defense counsel says, we didn't test anything, that we didn't think would have [Petitioner]'s DNA on it, which is ridiculous....
>
> It'd be ridiculous, to try to test those things; and defense counsel knows it; and [Petitioner] knows it; and what they're saying is, look over here; don't look at the actual evidence. Imagine, imagine a story that, where it's possible, that [Petitioner] didn't do this. That's what they're asking you to do; that's the ridiculous, alternative theory; imagine a story, where [Petitioner] couldn't do this; but that's not what reasonable doubt is; that is unreasonable doubt; that is pure speculation; and the state is not required, because we never

could disprove, every ridiculous possible theory, about what might have happened. There's no evidence, for any of that, zero evidence. The only evidence, that anybody stole [Petitioner]'s van, is the inconsistent stories, [Petitioner] told, that were obviously meant to fool, even, his own friends; to get sympathy; to find ways to push people, away from the idea, that he'd done this, or was planning to do this; and it was clear, that he was planning to do it. The interview speaks for itself; you all heard it; the investigators did not try to fool [Petitioner]. They, merely, asked him open-ended questions; asked him, whether he knew people, that they already knew he knew; and he lied about it; so yeah, they asked him a couple of things, that weren't literally true; but they knew Teafatiller had said, they were together, at that apartment complex; and he wouldn't, even, admit he was in an apartment complex in Mount Angel; he wouldn't, even, admit that he knew Teafatiller; so whatever else happened, in that interview, it doesn't undermine, what you learn from it; which is, that [Petitioner] was trying to hide his responsibility, for what he did. That's all you learned, from that interview that he is a liar; and he was trying to hide his responsibility for this crime….

Defense counsel and [Petitioner] are just trying to mislead you on that; look, closely, at the evidence; it speaks for itself.

Defense counsel did not object to these statements.

### III. Judgment and Sentence

The jury found [Petitioner] guilty as charged. The jury also found that [Petitioner] was armed with a deadly weapon during the commission of counts I–IV.

At sentencing, the trial court vacated counts III and IV (both for murder in the second degree). The court imposed a standard range sentence of 385 months' confinement.

*State v. Belander* (*Belander I*), 21 Wash. App. 2d 1064, 2022 WL 1223186, at *1–7 (Wash. Ct. App. Apr. 26, 2022) (cleaned up) (first footnote in original); Dkt. 14-1 at 17–28 (Direct Appeal).

Petitioner's total sentence included 385 months' incarceration imposed on count I (premeditated murder in the first degree), 385 months' incarceration imposed on count II (felony murder in the course of arson), and 17 months' incarceration imposed on count V (arson in the second degree). Dkt. 14-1 at 6 (Judgment and Sentence).

1    **II.      Procedural Background**

2         **A.      Direct Appeal**

3         Following his jury trial, Petitioner challenged his conviction on direct appeal. *See*

4    *Belander I*, 2022 WL 1223186; Dkt. 14-1 at 17–46 (Direct Appeal); Dkt. 14-1 at 48–94

5    (Opening Brief on Direct Appeal). On appeal, Petitioner argued, among other things, (1) the jury

6    lacked sufficient evidence to convict him of felony murder in the course of arson, (2) his

7    recorded statement asserting his right to silence was improperly admitted at trial in violation of

8    his rights outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966), (3) the prosecutor engaged in

9    unconstitutional misconduct when he maligned defense counsel during closing argument, and (4)

10   trial counsel was constitutionally deficient in failing to object to the admission of Petitioner's

11   assertion of his right to silence and the prosecutor's comments during closing argument. *See* Dkt.

12   14-1 at 49–50 (Opening Brief on Direct Appeal). The state court of appeals affirmed Petitioner's

13   convictions on counts I and V, but it concluded the jury lacked sufficient evidence to convict

14   Petitioner of felony murder and reversed his conviction on count II.[4] *Belander I*, 2022 WL

15   1223186, at *16; Dkt. 14-1 at 45 (Direct Appeal).

16        Petitioner then sought review by the Supreme Court of the State of Washington ("state

17   supreme court") raising the same argument raised in his direct appeal. *See* Dkt. 14-1 at 192–263

18   (Petition for Review). And, on September 7, 2022, the state supreme court denied review without

19   comment. *State v. Belander (Belander II)*, 200 Wash. 2d 1004, 516 P.3d 387 (2022); Dkt. 14-1 at

20   306 (Order Denying Review).

21

22

23        ---

          [4] Because Petitioner was sentenced to 385 months' incarceration on both counts I and II, his total sentence
     of confinement was unaffected by the reversal of count II on direct appeal. *See* Dkt. 14-1 at 6 (Judgment and

24   Sentence).

1

### B.    Instant Petition

2    Petitioner filed the instant Petition on September 6, 2023. Dkt. 1. On March 1, 2024,

3    Respondent filed, and attempted to serve on Petitioner, an Answer to the Petition. Dkts. 13, 15.

4    However, Respondent's first attempt to serve his Answer was unsuccessful and the Answer was

5    not served on Petitioner until March 14, 2024. Dkt. 15. Petitioner was previously advised of his

6    deadline for responding to the Answer and, even though his response deadline has now elapsed,

7    Petitioner has not responded or otherwise sought an extension of time to respond to the Answer.[5]

8    Therefore, the Petition is now ripe for consideration.

9    ### III.    Discussion

10    Petitioner raises three grounds for habeas relief in his Petition. On Ground One, he argues

11    portions of a recorded interview with law enforcement were impermissibly admitted into

12    evidence at trial in violation of his Fifth Amendment right against self-incrimination, as

13    incorporated to the States through the Fourteenth Amendment and expounded in *Miranda v.*

14    *Arizona*, 384 U.S. 436 (1966). Dkt. 1 at 5. Next, on Ground Two, Petitioner argues the

15    prosecutor engaged in prejudicial misconduct when he maligned defense counsel during closing

16    argument in violation of Petitioner's Fourteenth Amendment due process rights. *Id.* Finally, on

17    Ground Three, Petitioner argues trial counsel was constitutionally deficient in failing to object to

18    the admission of a recorded custodial interview into evidence at trial. *Id.* at 6. According to

19

20    _____

[5] In a prior Order, the Court explained:

21    The answer will be treated in accordance with LCR 7. Accordingly, on the face of the answer, Respondent shall note it for consideration on the fourth Friday after filing. Petitioner may file and

22    serve a response not later than the Monday immediately preceding the Friday designated for consideration of the matter, and Respondent may file and serve a reply not later than the Friday designated for consideration of the matter.

23    Dkt. 9 at 3. The Answer was noted for consideration on Friday, March 29, 2024 (Dkt. 13), so any response by Petitioner must have been filed by Monday, March 25, 2024. Thus, any response filed after the issuance

24    of this Report and Recommendation should be disregarded as untimely.

1   Petitioner, the recordings was obtained in violation of Washington state law and should have

2   been excluded from evidence. *Id.*

3        In his Answer, Respondent concedes Petitioner satisfied his obligation to exhaust his

4   state judicial remedies on all three grounds before seeking federal habeas relief. Dkt. 13 at 10.

5   *See Picard v. Connor*, 404 U.S. 270, 275 (1971) ("[A] state prisoner must normally exhaust

6   available state judicial remedies before a federal court will entertain his petition for habeas

7   corpus."); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999) ("[A] prisoner does not have to

8   ask the state for collateral relief, based on the same evidence and issues already decided by direct

9   review," rather "state prisoners must give the state courts one full opportunity to resolve any

10  constitutional issues.") (citing *Brown v. Allen*, 344 U.S. 443, 447 (1953)). Respondent also

11  concedes the Petition was timely filed within one-year of Petitioner's state-court judgment

12  becoming final. Dkt. 13 at 10. *See* 28 U.S.C. § 2244(d)(1)(A). So, rather than opposing the

13  Petition on these procedural grounds, Respondent opposes the Petition on the merits and

14  maintains the state courts' adjudication of each ground raised in the Petition was neither contrary

15  to, nor an unreasonable application of, clearly established federal law. Dkt. 13 at 12–28.

16      **A.    Review of Claims on the Merits**

17      Pursuant to 28 U.S.C. § 2254(d)(1) of the Anti-Terrorism Effective Death Penalty Act

18  ("AEDPA"), a federal court may not grant habeas relief on a claim previously adjudicated on the

19  merits in state court unless the state-court adjudication "resulted in a decision that was contrary

20  to, or involved an unreasonable application of, clearly established federal law, as determined by

21  the Supreme Court of the United States." In interpreting this portion of the federal habeas rules,

22  the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court

23  precedent if the state court either (1) arrives at a conclusion opposite to that reached by the

24

1    Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from

2    relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S.

3    362, 405 (2000).

4         Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

5    because that court concludes in its independent judgment that the relevant state-court decision

6    applied clearly established federal law erroneously or incorrectly. Rather, that application must

7    also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An

8    unreasonable application of Supreme Court precedent occurs "if the state court identifies the

9    correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

10   of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court

11   decision involves an unreasonable application of Supreme Court precedent "'if the state court

12   either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

13   where it should not apply or unreasonably refuses to extend that principle to a new context where

14   it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529

15   U.S. at 407).

16        Finally, the AEDPA requires federal habeas courts to presume the correctness of state

17   courts' factual findings unless applicants rebut this presumption with "clear and convincing

18   evidence." 28 U.S.C. § 2254(e)(1). Review of the relevant state court decisions under §

19   2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on

20   the merits." *Cullen*, 131 S.Ct. at 1398.

21   **B.    Ground One—*Miranda* Right Against Self-Incrimination**

22        In Ground One, Petitioner argues an audio recording of his refusal to answer questions

23   after he received his *Miranda* warnings was improperly admitted into evidence at trial in

24

violation of his right to silence and against self-incrimination. Dkt. 1 at 5. Petitioner also argues

this recording was obtained without his consent and without indicating the recording's start and

end time in violation of the Washington Privacy Act. *Id.* However, violations of state law cannot

give rise to federal habeas relief, see *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), so this second

argument is unavailing.

Regarding Petitioner's first argument, the Fifth Amendment to the United States

Constitution states no person "shall be compelled in any criminal case to be a witness against

himself." This right against self-incrimination, which is also referred to as the right to silence, is

made applicable to state prosecutions through the Fourteenth Amendment. *Malloy v. Hogan*, 378

U.S. 1 (1964); *Colorado v. Connelly*, 479 U.S. 157, 163 (1986); *Miller v. Fenton*, 474 U.S. 104,

110 (1985).

In *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme Court created a

prophylactic measure for guarding the right against self-incrimination by requiring the police to

advise a person of their rights before conducting a custodial interrogation. Before conducting a

custodial interrogation, the police must advise an individual of their right to remain silent and of

their right to have an attorney present during questioning. *Miranda*, 384 U.S. at 479.

A custodial interrogation may proceed only if the person knowingly and voluntarily

waives the right to remain silent and to an attorney. *Id.* at 444. This wavier need not be spoken

through talismanic phrase or even communicated affirmatively—an individual may implicitly

waive their rights simply by talking with police and answering questions. *Berghuis v. Thompkins*,

560 U.S. 370, 383–85 (2010).

Once an individual has waived their rights, the police may continue with their

interrogation unless and until the individual has "unequivocally" invoked their right to silence or

requested counsel. *See Miranda*, 384 U.S. at 474; *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Arizona v. Roberson*, 486 U.S. 675 (1988); *Minnick v. Mississippi*, 498 U.S. 146 (1990).

In *Doyle v. Ohio*, the United States Supreme Court held the right to remain silent contains an implicit assurance that "silence will carry no penalty," 426 U.S. 610, 618 (1976). The Court reasoned that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618. Thus, after *Doyle*, it is clearly established the government may not use a defendant's silence as evidence of guilt at trial. *Id.*

Though *Doyle*'s prohibition is clear, its application to a defendant's mirandized statements is not always straightforward. This is, in part, because an individual subject to custodial interrogation may refuse to answer a question—thereby invoking their right to silence as to a particular subject—without unequivocally invoking their right to silence in a manner that requires law enforcement to end the interrogation. The Ninth Circuit described this tension in *Hurd v. Terhune*:

> [The Supreme Court's decision in] *Thompkins* makes clear that a criminal defendant must affirmatively and unambiguously invoke his right to remain silent if he wishes to cut off police interrogation. When a suspect remains "largely silent" in response to officers' questions, the interrogation does not automatically have to cease. At the same time, when a defendant remains silent or refuses to answer a question posed by police, that silence or refusal is inadmissible. As the Court held in *Doyle*, a defendant's silence in response to a question is ambiguous because it may be no more than a reliance on the right to silence. That silence may not require police to end their interrogation, but it also does not allow prosecutors to use silence as affirmative evidence of guilt at trial…. [It is a fundamental principal] that a suspect's silence in the face of questioning cannot be used as evidence against him at trial, whether that silence would constitute a valid invocation of the "right to cut off questioning" or not.

*Id.*, 619 F.3d 1080, 1088 (9th Cir. 2010) (citing *Doyle*, 426 U.S. at 618–19 and *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 2260–63 (2010)).

Put another way, "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles,* 447 U.S. 404, 408 (1980). And, for these portions of a custodial interrogation, a prosecutor may appropriately "point out inconsistencies" with trial testimony and explore a defendant's prior "omission of critical details." *Leavitt v. Arave,* 383 F.3d 809, 827 (9th Cir. 2004) (citations omitted). In contrast, when a mirandized defendant refuses to answer a question, the prosecutor may not comment upon, or otherwise use, the defendant's refusal without violating his right against self-incrimination. *See, e.g.*, *Hurd*, 619 F.3d 1088–89. Thus, it is clearly established federal law "[a] suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his silence may be used against him at trial." *Id.* at 7 (citing *Miranda,* 384 U.S. at 473–74).

But determining whether a defendant's invocation of his right to silence was improperly admitted at trial is only one part of the Court's habeas analysis. Even where a prosecutor improperly comments on the defendant's post-*Miranda* silence, the error warrants federal habeas relief only if it caused actual prejudice. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–39 (1993).[6] For purpose of federal habeas review, actual prejudice occurs where a constitutional error has a "substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Thus,

> When the prosecutor's impermissible argument comments on [or the evidence exposes] a defendant's post-*Miranda* silence, the [habeas] court attempts to determine not whether the jury would have decided the same way even in the

---

[6] Additionally, where, as here, the state court did not affirmatively decide the constitutional issue and, instead, concluded any potential constitutional error was harmless, AEDPA precludes habeas relief unless the Petitioner can show the state court's "*harmlessness determination itself* was unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original). On the other hand, the Court need not "formally" address the statutory analysis if it finds the habeas claim fails under the more stringent actual-prejudice standard outlined in *Brecht. Davis v. Ayala*, 576 U.S. 257, 268 (2015); *Brown v. Davenport*, 596 U.S. 118, 134 (2022).

absence of the error, but whether the error influenced the jury. In making this determination, the court considers (1) the extent of the comments, (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting the defendant's guilt.

*Hurd*, at 1090 (citations and quotations omitted).

Here, the state court of appeals[7] determined Petitioner's argument regarding the admission of his alleged post-*Miranda* silence was raised for the first time on appeal. *Belander I*, 2022 WL 1223186, at *8–10; Dkt. 14-1 at 30–32 (Direct Appeal). So, after describing the applicable standard of review, the state court of appeals determined Petitioner had failed to show a manifest constitutional violation and declined examine the claim further:[8]

### II. Constitutional Right to Remain Silent

[Petitioner] argues that the State violated his right to due process and privilege against self-incrimination because it introduced the portion of the custodial interview where he asserted his right to counsel and his right to remain silent. Specifically, [Petitioner] appears to contend that the State's introduction of the custodial interview amounted to an impermissible comment on his right to remain silent. Because [Petitioner] raises this issue for the first time on appeal and fails to demonstrate manifest error, we decline to reach the issue.

#### A.      Legal Principles

Generally, a party may not raise an issue for the first time on appeal. RAP 2.5(a). However, RAP 2.5(a)(3) allows a party to raise an issue for the first time on appeal where the issue involves a "manifest error affecting a constitutional right." As explained above, the "[a]pplication of RAP 2.5(a)(3) depends on the answers to two questions: '(1) Has the party claiming error shown the error is truly of

---

[7] The Court looks to the decision of the state court of appeals because it is the "last reasoned opinion" on the matter. *See Ylst v. Nunnemaker,* 501 U.S. 797, 8030 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

[8] Although the state court of appeals determined Petitioner's claim was barred under a state procedural rule, its application of that rule was based on the substantive determination no manifest constitutional violation occurred. Also, habeas courts "rely on the 'presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis.'" *Runningeagle v. Ryan,* 686 F.3d 758, 769 (9th Cir. 2012) (citing *Harrington v. Richter,* 562 U.S. 86, 99 (2011)). As such, the Court presumes the state courts' adjudication of Petitioner's right-to-silence claim was on the merits.

REPORT AND RECOMMENDATION - 17

constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?' " [*State v. Grott*, 195 Wn.2d 256, 267, 458 P.3d 750 (2020) (quoting *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015))].

An error is "manifest" if an appellant shows actual prejudice. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id*. (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

**B. [Petitioner] Fails to Demonstrate Manifest Error**

Here, the State introduced a redacted portion of the recorded custodial interview at trial. The State omitted the portion of the recording where [Petitioner] was given *Miranda* warnings and where he invoked his right to counsel. The recording concluded with the following exchange:

> [Petitioner]: Look, I'm not answering hard questions, so.
> Detective Buettner: Okay, that one a hard one?
> [Petitioner]: No, it's not a hard one. It's just like I'm tired of dealing with all this bullsh*t.

At the end of the recording, the State did not follow up with Detective Schultz concerning [Petitioner]'s statement that he was "tired of dealing with all this bullsh*t." Instead, the State began to question Detective Schultz about [Petitioner]'s whereabouts based on his cell phone records and camera footage obtained. Presumably, the State sought to compare [Petitioner]'s statements in the custodial interview with those records to prove its theory that he was with the Chrysler Voyager at the time of Bodle's death.

Here, even if we assume, without deciding, a constitutional error, [Petitioner] does not demonstrate any prejudice; rather, he contends that we must presume that the alleged error was prejudicial. Because [Petitioner] fails to carry his burden to demonstrate actual prejudice from the statement in the custodial interview, there is no manifest constitutional violation. *O'Hara*, 167 Wn.2d at 99, 217 P.3d 756. Accordingly, we decline to reach this issue raised for the first time on appeal.

*Belander I*, at *8–10 (footnotes omitted); Dkt. 14-1 at 30–32.

Even assuming—as the state courts did—the admission of Petitioner's recorded statement violated his right to silence and against self-incrimination, this alleged error did not cause actual

1    prejudice as required by *Brecht*, 507 U.S. at 637. Looking first to the extent at which Petitioner's

2    silence was commented on, the prosecution referenced Petitioner's silence only once by playing

3    the recording of his custodial interrogation for the jury:

4        [Detective Buettner]: Okay, so then who lives there?
         [Petitioner]: Honestly, like I said, why does that matter? Like...

5        [Detective Buettner]:  Because.
         [Petitioner]: Just a friend of mine that isn't involved with me like that, you know

6        what I mean? Like, I don't understand why you need to know all these names.
         [Detective Buettner]: She's not involved with you, like what?

7        [Petitioner]: Like, she doesn't do drugs.
         [Detective Buettner]: Okay.

8        [Petitioner]: Okay, she...
         [Detective Buettner]: I'm not a drug cop, so that's fine.

9        [Petitioner]: Well, okay, I'm just saying like she, you know, let me stay there for a
         night, you know, she's got kids. You know, I mean, like, I'm not trying to, like,

10       have a bunch of drama --
         [Detective Buettner]: Uh-hum.

11       [Petitioner]: -- come to her place like that, especially when she is good people, so.
         [Detective Buettner]: So, what was her name?

12       [Petitioner]:  *Look, I'm not answering hard questions*, so.
         [Detective Buettner]: Okay, that one a hard one?

13       [Petitioner]:  No, it's not a hard one. *It's just like I'm tired
         of dealing with all this bullshit.*

14       (Recording ends)

15    Dkt. 14-1 at 1895–96 (Transcript of Custodial Interrogation) (emphasis added). This single

16    reference to Petitioner's refusal to answer a particular question made during a multi-day trial

17    could not have influenced the jury. *See, e.g., Hurd* 619 F.3d at 1090 ("In *Brecht,* the Supreme

18    Court held that *Doyle* error did not influence the jury because the prosecution's references to the

19    defendant's post-*Miranda* silence were infrequent, comprising fewer than two pages of the 900–

20    page trial transcript.").

21         Next, the state-court record contains no indication the prosecution stressed an inference

22    of guilt from Petitioner's refusal to answer "hard questions" or his statement he was "tired of

23    dealing" with the officer's questions. Rather, the prosecution focused on the preceding portion of

24    the interrogation covering where Petitioner had stayed in the weeks leading up to the murder. *See*

Dkt. 14-1 at 1893–96 (Transcript of Custodial Interrogation); *id.* at 1341–63 (Direct Examination

Following Publication of Custodial Interrogation); *see also Belander I*, 2022 WL 1223186, at *6

("During the direct examination of Detective Schultz, the State did not follow up on

[Petitioner]'s comment at the conclusion of the recording. Instead, the State questioned Detective

Schultz on [Petitioner]'s whereabouts based on his cell phone records and camera footage.").

      Finally, the other evidence suggesting Petitioner's guilt at trial was extensive and

included, among other things, the proximity of the victim's body to a vehicle linked to Petitioner

(Dkt. 14-1 at 771–78, 899–903), the presence of Petitioner's DNA on items at the crime scene

(*Id.* at 1229–31, 1242–47), and Petitioner's own text messages in the hours following the murder,

stating his clothes were "wet and bloody," (*Id.* at 1375), "I've got myself into a situation, where I

had to leave my car and almost everything I owned, to disappear, so I really need some new

clothes and shoes," (*id.* at 1616), "I've ruined my life completely and it's all my fault" (*id.* at

1620), and "I might be in prison the rest of my life," (*id.* at 1619). In the face of this otherwise

overwhelming evidence of guilt, a single reference to Petitioner's post-*Miranda* silence was

immaterial. *See, e.g., Brecht*, 507 U.S. at 639.

      Accordingly, the admission of Petitioner's post-*Miranda* refusal to answer questions at

trial, even if impermissible, does not warrant federal habeas relief. As such, the state courts'

adjudication of Petitioner's right-to-silence claim was not contrary to, or an unreasonable

application of, clearly established federal law and so Petitioner's request for relief on Ground

One should be denied.

### C.    Ground Two—Prosecutorial Misconduct

      On Ground Two, Petitioner argues the prosecutor engaged in unconstitutional misconduct

when he made certain disparaging statements aimed at defense counsel and his theories. Dkt. 1 at

5. Petitioner takes issue with the following statements made during the State's closing argument: stating defense arguments are "smoke and mirrors," calling alternate theories urged by defense counsel "ridiculous," and claiming defense counsel is "trying to confuse" and "mislead" the jury. *Id.*; *see also* Dkt. 14-1 at 1786–87, 1790 (Transcript of Closing Argument).

The United States Supreme Court has long "counselled prosecutors 'to refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Even so, the standard of review for unconstitutional misconduct by prosecutors is "'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642 (1974)). Within this narrow scope of review, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. And "prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000); *see also United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence"), *as amended on denial of reh'g* (Apr. 15, 1993). On the other hand, "[a] prosecutor may not... base closing argument on evidence not in the record." *U.S. v. Sanchez-Soto*, 617 Fed. App'x. 695, 697 (9th Cir. 2015).

In determining if prosecutorial misconduct rises to the level of constitutional error, the relevant inquiry is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (*Darden* standard is "clearly

established Federal law" for purposes of 28 U.S.C. § 2254(d)). Importantly, courts must evaluate the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33–34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). To this end, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). The Court may also consider whether the prosecutor's comments manipulated or misstated the evidence, whether the comments were "invited" by defense counsel, whether the trial court gave a curative instruction, and whether the weight of untainted evidence was against the accused. *See Darden*, 477 U.S. at 181–82; *Young*, 470 U.S. at 11–14.

As discussed above, even where a constitutional error has occurred, habeas relief is not warranted unless the error caused actual prejudice, meaning it had a "substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. 637. In this regard, it is a petitioner's burden to state facts pointing to a real possibility of constitutional error. *See O'Bremski v. Maass*, 915 F.2d 418, 420 (9th Cir. 1990).

The state court of appeals addressed Petitioner's prosecutorial-misconduct claim as follows:

### III. PROSECUTORIAL MISCONDUCT

[Petitioner] argues that the prosecutor made numerous statements during closing argument that improperly maligned defense counsel. [Petitioner] contends that the alleged misconduct requires us to reverse his convictions. We disagree.

#### A. Legal Principles

The right to a fair trial in a criminal case is guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 22 of the Washington Constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both

improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). The prosecutor's conduct is viewed in "'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

First, we determine whether the prosecutor's conduct was improper. *Emery*, 174 Wn.2d at 759, 278 P.3d 653. If the prosecutor's conduct was improper, then the question turns to whether the prosecutor's improper conduct resulted in prejudice. *Id*. at 760, 278 P.3d 653. To establish prejudice, the defendant must show a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id*.

Because [Petitioner] did not object to any of the prosecutor's arguments that he now alleges are improper, he "is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id*. at 760–61, 278 P.3d 653. Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761, 278 P.3d 653 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). The focus is on whether the resulting prejudice could have been cured. *Id*. at 762, 278 P.3d 65. …

**[B]. Impugning Defense Counsel**

[Petitioner] contends that the prosecutor committed reversible misconduct by repeatedly impugning defense counsel's integrity during closing arguments. We hold that [Petitioner] waived this challenge.

A prosecutor may argue that the evidence does not support the defense's theory. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). However, "[i]t is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *Thorgerson*, 172 Wn.2d at 451, 258 P.3d 43. "Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." *Lindsay*, 180 Wn.2d at 432, 326 P.3d 125.

In *Lindsay*, our Supreme Court concluded that, among the numerous rude and self-serving exchanges between counsel that permeated the record, one statement by the prosecutor impugned defense counsel: "This is a crock. What you've been pitched for the last four hours is a crock." *Id*. at 433, 326 P.3d 125. The court reasoned that describing defense counsel's argument as a "crock"

impugned defense counsel's integrity because it implied that defense counsel was deceptive and dishonest. *Id*. at 433–34, 326 P.3d 125.

Similarly, in *Thorgerson*, our Supreme Court concluded that the prosecutor impugned defense counsel's integrity by referring to his presentation of the case as "bogus" and involving "sleight of hand." 172 Wn.2d at 451–52, 258 P.3d 43. The court reasoned that the prosecutor went beyond the bounds of acceptable behavior in disparaging defense counsel because their comments implied wrongful deception or even dishonesty in the context of a court proceeding. *Id*. at 452, 258 P.3d 43. However, despite the prosecutor's improper and ill-intentioned conduct, *Thorgerson* turned on the defendant's failure to object: the court held that "a curative instruction would have alleviated any prejudicial effect of this poorly thought out attack on defense counsel's strategy." *Id*.

Here, [Petitioner] contends that the prosecutor repeatedly impugned defense counsel's integrity during closing arguments. But merely showing that the prosecutor maligned defense counsel is not enough in this situation. Even assuming, without deciding, that the prosecutor's statements impugned defense counsel, like *Thorgerson*, [Petitioner] fails to show that the prosecutor's alleged misconduct was so flagrant and ill-intentioned that an instruction to disregard the prosecutor's characterization of the defense's theories could not have cured any resulting prejudice.

[Petitioner] argues that a curative instruction would have been ineffective because "the misconduct came during the prosecutor's rebuttal argument and thus were the last words heard by the jury before deliberations." On the contrary, the placement of the comments alone is insufficient to amount to incurable prejudice. The alleged misconduct here does not rise to the level of incurable prejudice because the prosecutor's statements were not so egregious and pervasive. Incurable prejudice has been described as that which, in effect, causes a mistrial because nothing short of a new trial can repair the injury caused by the prosecutor's remarks. *Emery*, 174 Wn.2d at 762, 278 P.3d 653.

Here, [Petitioner] relies on three statements from the prosecutor's rebuttal argument that were said closely in time to support his claim for prosecutorial misconduct. Specifically, [Petitioner] relies on the prosecutor's statements when he said that defense counsel was "(1) trying to 'confuse' jurors with 'smoke and mirrors,' (2) 'just trying to mislead jurors,' and (3) telling jurors to 'look over here; don't look at the actual evidence.'" Unlike *Lindsay*, here, there were not multiple, pervasive instances of misconduct throughout the trial; the alleged misconduct occurred only in closing argument. Like *Thorgerson*, even if the prosecutor improperly impugned defense counsel, again, an issue which we do not decide, we conclude that a curative instruction would have alleviated any prejudicial effect of

the prosecutor's attack on defense counsel's strategy. 172 Wn.2d at 452, 258 P.3d 43.

>    Because [Petitioner] cannot show that the alleged misconduct was so flagrant, ill-intentioned, and pervasive that an instruction could not have cured any resulting prejudice, we hold that [Petitioner] has waived this argument by failing to object at the time.

*Belander I*, 2022 WL 1223186 at *9–11; Dkt. 14-1 at 32–37 (Direct Appeal).[9]

At the outset, the Court notes a prosecutor may vigorously attack a defense theory during his closing argument. *See, e.g., Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) ("Calling an argument on his behalf 'trash' cannot be characterized as improper.") (citing *See United States v. Davis,* 15 F.3d 1393, 1402–03 (7th Cir.1994) (prosecutor's references to defendant's case as "trash," "hogwash," and "garbage" did not deny defendant due process)). Nevertheless, the Court assumes the statements Petitioner challenges may fairly be considered to malign defense counsel and impugn his credibility. Even so, by viewing the prosecutor's statements in context and considering the influence those statements may have had on the jury, the state court of appeals did not unreasonably determine any potential constitutional error was harmless, nor was its decision contrary to clearly established federal law.

Viewed in context, the prosecutor fairly supported each of his challenged statement with evidence presented during Petitioner's trial.[10] Although it may have been preferable for the

---

[9] As with Petitioner's right-to-silence claim, the state court of appeals determined his prosecutorial-misconduct claim was barred under a state procedural rule. However, this decision was based on its substantive determination no substantial prejudice resulted from the alleged violation. Because the state courts' decision lies within ambiguous territory between procedure and substance, the Court presumes the prosecutorial-misconduct claim was adjudicated "on the merits" under AEDPA. *Runningeagle*, 686 F.3d at 769 (citing *Harrington*, 562 U.S. at 99).

[10] The challenged statements in context are as follows:

>    The fact that, there were other people, potentially, involved doesn't, in the slightest way, make it, less likely, that [Petitioner] was involved. His DNA was there; he left his cap there, right. We know that this happened really fast, right; they had about five, six, seven minutes, something like that, to get to Park, stop this car, from where they stopped the car, they had, about seven minutes, to either kill Mr. Bodle, or maybe, more likely, drag his already dead, or dying body, that they slammed over the head three times, at least three times; and left a two-inch gaping hole in the skull;

prosecutor to suggest rather than conclude defense counsel lacked credibility, *see Young*, 470 U.S. at 8–9 ("[A prosecutor] must refrain from interjecting personal beliefs into the presentation of his case."), the prosecutor's statements "did not manipulate or misstate the evidence, nor did [they] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden*, 477 U.S. at 182. Moreover, several of the challenged statements were "invited" by and directly responsive to defense counsel's arguments, which diminishes any prejudice the statements may have caused. *Id.* at 182 ("[T]he idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole.") (citation

---

drag him into the forest; throw a burning piece, of something, into the van; and up it goes; that's what the arson person told you; that's all it would take. No other alternative makes sense, with the evidence.

**[Defense Counsel] gave you an alternate theory, that is ridiculous**. It doesn't make any sense at all. That theory is sure fanciful speculation, and that's all it is, right; because in order to believe it, you've got to believe that, [Petitioner] wasn't lying about the van, and yet, he, clearly, was lying about the van. There's no other explanation for it. He didn't even tell a consistent story, to his friends, and then, when he had the chance to talk to law enforcement, [Defense Counsel] will make a big deal, about how they didn't tell him, why he was there; he knew why they were there. Look at the Facebook messages; he knew, exactly, what was going on; he was concerned, about the van being reported stolen; he knew, exactly, what was going on.

**All of that, is just smoke and mirrors, and [Defense Counsel is] trying to confuse you, right,** because in his own words, he think he'll beat it, which, that's not, "I didn't do it, dad." Dad said, "I know you weren't the only one up on that mountain that night;" and a normal person, confronted with that statement says, "dad, I wasn't there, right, it wasn't me. I don't know why they charged me with this." He didn't say that. He said, "yeah, I think I'll beat it, I think I'll beat it," because he thought he covered his tracks, but he didn't; he left a lot, a lot of evidence.

**Now, [Defense Counsel] says, we didn't test anything, that we didn't think would have [Petitioner]'s DNA on it, which is ridiculous.** Nobody, really, thought [Petitioner]'s DNA was gonna be on Mr. Bodle's shoe, right. The shoe, we tested the inside of the shoe. Everybody thought that shoe came off of Mr. Bodle; we tested it anyway....

Dkt. 14-1 at 1786–87 (Transcript of Closing Argument) (emphasis added). And:

[Defense Counsel] would have you believe that, every time [Petitioner] said, "I'm in trouble," "I gotta get away," "I'm gonna be in a lot of trouble," he was referring to some other charges. When he said, "I'm gonna spend life in prison," or whatever, which he said, to at least two different people, right; that he was talking about something else; but if you, actually, read the Facebook things, they're connected, right; it's connected, to the fact, that he won't turn in the person, who stole his van; that he won't report it stolen; those are all connected; so he's, clearly, talking about what happened here, right. **[Defense Counsel] and [Petitioner]are just trying to mislead you on that**; look, closely, at the evidence; it speaks for itself.

*Id.* at 1790 (emphasis added).

omitted). Finally, in light of the substantial evidence of Petitioner's guilt (*See* discussion and accompanying record citations *supra* and block quotation *infra*) these relatively few statements by the prosecution, even if improper, could not have injuriously influenced the jury's verdict. *Id.* (concluding "overwhelming" evidence of guilt "reduced the likelihood that the jury's decision was influenced by argument.").

For these reasons, the Court finds the state courts' decision to deny Petitioner's prosecutorial-misconduct claim was neither contrary to, nor an unreasonable application of, clearly established federal law. As such, Petitioner's claim for habeas relief on Ground Two is unavailing and should be denied.

### D.    Ground Three—Ineffective Assistance of Trial Counsel

On Ground Three, Petitioner argues defense counsel was constitutionally deficient in failing to object to the introduction of audio recordings allegedly obtained in violation of state law. Dkt. 1 at 6. Petitioner urges these recordings were the centerpiece of the State's closing argument and argues this demonstrates his attorney's failure to object was prejudicial. *Id.*

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part test for determining whether a defendant received ineffective assistance of counsel. First, a defendant must demonstrate his attorney's performance was deficient, which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

Under the first prong, the reasonableness of an attorney's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

1    presumption that counsel's conduct falls within the wide range of professional assistance; that is,

2    the defendant must overcome the presumption that, under the circumstances, the challenged

3    action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

4    Under the prejudice prong, a petitioner must establish there is a reasonable probability the

5    results would have been different but for counsel's deficient performance. *Kimmelman v.*

6    *Morrison*, 477 U.S. 365, 375 (1986); *Strickland,* 466 U.S. at 696. "A reasonable probability is a

7    probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A]

8    court need not determine whether counsel's performance was deficient before examining the

9    prejudice suffered by the defendant as a result of the alleged deficiencies…. If it is easier to

10   dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, …that course

11   should be followed." *Id*. at 697.

12   Federal courts sitting in habeas review afford considerable deference to a state courts'

13   adjudication of an ineffective-assistance-of -counsel claim. *Yarborough v. Gentry*, 540 U.S. 1, 5-

14   6 (2003); *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018) (a federal court's deference is "near

15   its apex" when the state courts' decision "turns on general, fact-driven standards such as

16   suggestiveness and reliability"). The deference given to a state court decision is just one of two

17   layers of deference given to ineffective-assistance-of-counsel claims; because defense attorneys

18   have great latitude in deciding how best to represent their client, the Court's review of an

19   attorney's representation is also deferential. *Gentry*, 540 U.S. at 5–6. As a result, a habeas court's

20   review of ineffective-assistance-of-counsel claims is "doubly deferential," with deference

21   afforded to the state courts' adjudication and the representational decisions made by defense

22   counsel. *Id*. at 6.

23

24

Finally, because the *Strickland* standard contains two prongs, a habeas petitioner must prove the state court decided both prongs unreasonably to obtain habeas relief. *Shinn v. Kayer*, 141 S. Ct. 517, 523-24 (2020). Therefore, if a fair-minded jurist could agree with the state courts' decision on either prong of the *Strickland* standard, then federal habeas relief is unavailable. *Id.*

Here, the state court of appeals agreed with Petitioner that, had his attorney objected, the challenged recordings would have been excluded under Washington state law. *Belander I*, 2022 WL 1223186, at *14; Dkt. 14-1 at 42 (Direct Appeal). Even so, the state court of appeals found Petitioner's claim failed under the first *Strickland* prong because his attorney's decision not to object to the recordings was explainable by sound trial strategy. *Belander I*, at *14; Dkt. 14-1 at 42. The state court of appeals also concluded Petitioner's claim failed under the second *Strickland* prong because the existence of other overwhelming evidence of guilt preserved confidence in the outcome at trial. *Belander I*, at 15; Dkt. 14-1 at 42–44. The full analysis of the state court of appeals is as follows:

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

[Petitioner] contends that his trial counsel provided him constitutionally ineffective assistance when he failed to raise an objection to the admissibility of the custodial interview and certain statements made in that recording. Specifically, [Petitioner] argues that counsel provided him ineffective assistance by failing to object to the admission of the custodial interview because: it violated the WPA….We disagree.

**A. Legal Principles**

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantees a defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). An ineffective assistance of counsel claim is a mixed question of fact and law that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Grier*, 171 Wn.2d at 32-33, 246 P.3d 1260. If the defendant fails to satisfy either prong, the defendant's ineffective assistance of counsel claim fails. *Id*. at 33, 246 P.3d 1260. When the defendant bases his ineffective assistance of counsel claim on defense counsel's failure to object, the defendant must show that the objection would have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33, 246 P.3d 1260. We engage in a strong presumption that counsel's performance was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant may overcome this presumption by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33, 246 P.3d 1260 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). "The defendant has the burden to show that defense counsel's performance was deficient based on the trial court record." *State v. Vazquez*, 198 Wash.2d 239, 248, 494 P.3d 424 (2021). "Specifically, 'the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Id*. (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)).

To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862, 215 P.3d 177.

**B. Defense Counsel's Assistance was not Constitutionally Ineffective**

As an initial matter, the record is sufficient for us to determine that defense counsel's performance was not deficient by not objecting to the admission of the custodial interview. *Vazquez*, 198 Wash.2d at 248, 494 P.3d 424.

Here, as explained above, RCW 9.73.090(1)(b) expressly authorizes the police to record custodial statements so long as the recording strictly conforms with four statutory requirements. However, both portions of the custodial interview did not "commence with an indication of the time of the beginning thereof" or "terminate with an indication of the time thereof." RCW 9.73.090(1)(b)(ii). Therefore, both recorded portions of [Petitioner]'s custodial interview violated the WPA. RCW 9.73.090(1)(b)(ii). As result, an objection to the admission of the custodial interview likely would have been sustained. *Gerdts*, 136 Wn. App. at 727, 150 P.3d 627.

However, the admission of the custodial interview permitted defense counsel to argue in closing that any guilty conscience [Petitioner] had could be explained by the fact that he was involved in a separate criminal matter in Yamhill

County—not about Bodle's death. Therefore, defense counsel's failure to object to the admission of the custodial interview does not constitute deficient performance because there is a conceivable, legitimate trial tactic explaining counsel's decision. *See Grier*, 171 Wn.2d at 33, 246 P.3d 1260. Accordingly, [Petitioner] fails to show that defense counsel was deficient in failing to object to the admission of the custodial interview….

[E]ven if defense counsel was deficient for failing to object to certain statements made by him in the custodial interview, [Petitioner] fails to establish prejudice. There is an overwhelming amount of untainted evidence that supports the jury's finding of guilt even in the absence of the recorded custodial interview.

The evidence at trial showed that in January 2019, [Petitioner] borrowed Lewis's red or maroon 2002 Chrysler Voyager. Lewis stated that was "pretty common to have jugs of water in the car" because the van was known to overheat. Teafatiller stated that [Petitioner] arrived at her apartment in a red minivan when he came to pick up Bodle and that he asked her to fill up water jugs for the van because it was having an overheating problem. Therefore, this was the same van that [Petitioner] showed up in to pick up Bodle. Shortly thereafter, [Petitioner] gave Bodle a ride to Portland to purchase heroin. This point is corroborated by [Petitioner]'s cell phone records which show him travelling from Mount Angel at about 3:00 a.m. to areas just outside of the Portland metro area at about 6:00 a.m.

There is circumstantial evidence that [Petitioner] was with Lewis's 2002 Chrysler Voyager at the time Bodle was killed. Specifically, [Petitioner]'s cell phone records show him in the Washougal and Vancouver areas from 3:32 p.m. to 7:05 p.m. There was no cell phone activity from about 7:00 p.m. to 11:00 p.m., but there was surveillance footage of Lewis's Chrysler Voyager going towards the crime scene with a dark sedan following it during that time. That dark sedan then passed the Swift Dam cameras again roughly 20 minutes later, heading back toward Woodland. Detective Schultz testified that the timing indicated on [Petitioner]'s phone records and the surveillance footage was consistent with how long it would take to travel to and from Forest Road 83, where the burnt van and Bodle's body was found, from the Vancouver area.

There is also other overwhelming circumstantial evidence implicating [Petitioner]'s involvement in Bodle's murder. Specifically, the evidence at trial showed that [Petitioner] was not primarily known as a heroin dealer. And prior to January 23, 2019, [Petitioner] had not messaged anybody about heroin. However, [Petitioner] informed at least 10 people that he had heroin for sale in the late hours of January 23, after Bodle presumably purchased it and died. Additionally, as soon as [Petitioner]'s cell phone pinged off a cell tower for the first time in about four hours (since 7:00 p.m.), he began messaging friends about needing help and fresh clothes because his were "wet and bloody." [Petitioner] even gave his friends

conflicting stories as to what make the van was or what happened to the van. [Petitioner] also expressed guilt by telling his friends that he needed to leave the state, that he might be going to prison for the rest of his life, and that he ruined his life and it was all his fault. Furthermore, [Petitioner]'s DNA was found at the crime scene, but most importantly, on the scrunched up portion of the jacket that Bodle was wearing at the time of his death.

Because there is an overwhelming amount of untainted evidence that supports the jury's finding of guilt, the result of the proceeding would not have been different even if the custodial interview was excluded. *See Kyllo*, 166 Wn.2d at 862, 215 P.3d 177. Accordingly, we hold that [Petitioner]'s ineffective assistance of counsel claim fails.

*Belander I*, at *13–15 (record citations omitted); Dkt. 14-1 at 40–44 (Direct Appeal).

Here, the Court's review is doubly deferential, with deference given to both the state courts' decision and the decisions made by Petitioner's trial counsel. *Gentry*, 540 U.S. at 5–6. Moreover, the Court's deference is "near its apex" because the state courts' adjudication of both *Strickland* prongs was heavily fact driven. *Sexton*, 585 U.S. at 968.

Affording the appropriate level of deference, the Court finds the state courts' adjudication of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law. Regarding the first *Strickland* prong, the state courts reasonably determined the lack of an objection from the defense as to the admissibility of unlawfully obtained recordings was explainable by a sound trial strategy and, therefore, the defense attorney's failure to object did not fall below prevailing professional norms. *Strickland*, 466 U.S. at 689. Likewise, on the second *Strickland* prong, the state courts reasonably determined there was no reasonable probability the outcome at trial would have been different, particularly in light of the other overwhelming evidence of Petitioner's guilt. *Id.* at 696.

Petitioner urges a different result, asserting the prosecutor placed considerable weight on the challenged recordings during his closing argument. Dkt. 1 at 6. This assertion is not supported by the record—but, even if it was, it does not change the fact there was considerable

1    other evidence upon which the jury could have relied to reach their guilty verdict. As such,

2    Petitioner has failed to show a fair-minded jurist would disagree with the state courts'

3    adjudication of his ineffective-assistance-of-counsel claim and so his request for federal habeas

4    relief on Ground Three should be denied.

5    **IV.    Evidentiary Hearing**

6        The decision to hold an evidentiary hearing is committed to the Court's discretion.

7    *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

8    hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

9    entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

10   available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

11   state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

12   entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

13   record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

14   court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to

15   hold an evidentiary hearing because, as discussed in this Report and Recommendation,

16   Petitioner's grounds for relief may be resolved on the existing state court record.

17   **V.    Certificate of Appealability**

18       A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

19   court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

20   from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue

21   . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right."

22   28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason

23   could disagree with the district court's resolution of his constitutional claims or that jurists could

24

REPORT AND RECOMMENDATION - 33

1   conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-*

2   *El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

3       No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or

4   would conclude the issues presented in the Petition should proceed further. Therefore, the Court

5   concludes Petitioner is not entitled to a certificate of appealability with respect to the Petition.

6   **VI.      Conclusion**

7       For the above stated reasons, the Court concludes Petitioner has not shown the state

8   courts' adjudication of any ground raised in the Petition was both contrary to and an

9   unreasonable application of clearly established federal law. Additionally, no reasonable jurist

10  would debate the outcome recommended here. Therefore, the undersigned recommends the

11  Petition (Dkt. 1) be denied and a certificate of appealability not be issued.

12      Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

13  fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

14  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

15  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

16  objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

17  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

18  imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on May

19  3, 2024, as noted in the caption.

20      Dated this 12th day of April, 2024.

David W. Christel
United States Magistrate Judge

REPORT AND RECOMMENDATION - 34